STATE OF NORTH CAROLINA v. DAVID MICHAEL REILLY

No. 8324SC1303

(Filed 6 November 1984)

**1. Criminal Law § 163— issue of plain error—motion to suspend rules not required**

No motion to suspend the rules is required in order to raise the issue of plain error in the brief, but the brief must specifically and not obliquely raise the issue.

**2. Criminal Law § 60.5— breaking or entering and larceny—sufficiency of fingerprint evidence**

The State's fingerprint evidence was sufficient to support conviction of defendant for breaking or entering of a restaurant and larceny of property therefrom where it tended to show: the restaurant's locked safe was broken open and money was taken therefrom; an employee time clock was broken, a cigarette vending machine was destroyed, and the premises were generally vandalized; defendant's fingerprints were found on the inside of the cigarette machine; the prints had been placed on the machine within 48 hours and would have begun to deteriorate after 60 hours; defendant, a former employee of the restaurant, had been fired for missing work and had not worked there for ten days prior to the crimes; defendant stated at the time of his arrest that his fingerprints could not have been on the machine because he didn't smoke or use matches; and although defendant testified that he had placed his hand in the machine and removed matches therefrom while he was employed at the restaurant, there was no evidence of a specific time or occurrence when defendant's fingerprints could have been lawfully impressed on the machine.

**3. Criminal Law §§ 60.5, 163.3— failure to instruct on fingerprint evidence—no plain error**

The trial court did not commit plain error in failing to give an unrequested special instruction on fingerprint evidence since fingerprint evidence

1

concerned a subordinate feature of the case, and the absence of such instruction had no probable impact in the jury finding of guilt.

4. **Constitutional Law § 48— failure to request instruction on fingerprints—no ineffective assistance of counsel**

The failure of defendant's trial counsel to submit a request for jury instructions on fingerprints, a subordinate feature, was not ineffective assistance of counsel.

5. **Criminal Law § 89.6— impeachment of alibi witnesses—religious beliefs and affiliations**

Where a showing of a special relationship between defendant and his alibi witnesses through their membership in a religious group called The Way International formed a part of the defense of alibi, the trial court properly allowed the State to impeach the credibility of the alibi witnesses by cross-examination of the witnesses concerning their religious beliefs and affiliations. Furthermore, the father of one alibi witness was properly permitted to impeach the credibility of the witness by testifying that the witness had told him that she was not with defendant on the night in question but would testify for defendant because she believed he was innocent based upon her personal relationship with defendant in The Way.

Judge EAGLES dissenting.

APPEAL by defendant from *Friday, Judge*. Judgment entered on 15 April 1983 in Superior Court, WATAUGA County. Heard in the Court of Appeals 19 September 1984.

*Attorney General Rufus L. Edmisten by Associate Attorney Newton G. Pritchett, Jr., for the State.*

*Scott E. Jarvis for defendant appellant.*

BRASWELL, Judge.

Fingerprints have impressed themselves as the major theme of this case. Someone committed the crimes of Breaking or Entering and Larceny at Makotos Japanese Restaurant in Boone on 21 November 1982. By his direct appeal, we are called upon to review the sufficiency of the evidence to support the conviction of defendant David Michael Reilly as the perpetrator, to determine whether to apply the plain error rule to jury instructions regarding fingerprints, and to determine whether the State's impeachment of Reilly's witnesses on cross-examination was proper.

[1] In addition to these issues raised on direct appeal, Mr. Reilly, through two post-trial motions originally filed in this Court, has

asked: (1) for a suspension of the rules so as to brief and argue the inadequacy of jury instructions on fingerprint evidence and (2) for a new trial by his motion for appropriate relief on the grounds that his trial counsel was ineffective. Given the record and full transcript as brought forward, we conclude that his motion for appropriate relief may be determined on the basis of the materials before us. No further evidence need be taken and no other proceedings need be conducted. *See* G.S. 15A-1418(b). With regard to the defendant's motion for a suspension of the appellate rules, we note that counsel argued plain error in his brief without waiting for any ruling on the motion. As we understand, *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983), and related cases which discuss plain error, no motion to suspend the rules is required in order to raise the issue of plain error in the brief, but the brief must specifically and not obliquely, raise the issue.

The second listed question in the defendant's brief, stated as a declarative sentence by appellate counsel, is as follows: "The trial court committed plain error by failing to properly instruct the jury on the law regarding fingerprint evidence." We perceive that a resolution of the subject of fingerprints will resolve all of the foregoing questions and motions without regard to the label affixed. To accomplish this we now summarize the "life of Reilly" leading to his arrest and jury conviction.

For a short time (8 September 1982 to 11 November 1982) Mr. Reilly was employed as a janitor at Makoto's Japanese Restaurant. When Reilly missed one day at work, he was discharged. The firing occurred on 11 November 1982. Mr. Reilly was last upon the premises on 19 November 1982 when he picked up his final check and performed the chore of taking out buckets of rainwater from a leaky roof, for which he was paid.

Mr. Reilly had moved to Boone in August 1982 from Massachusetts by way of New Knoxville, Ohio, in order to establish a fellowship of The Way International in Boone. While in Ohio he had met Pat Yacongis and Lee Metzger who also went to Boone and who were among the several witnesses for the defendant.

On the morning of 21 November 1982 the restaurant's previously locked safe was found at the bottom of the stairs, open, empty, and damaged, and with several thousand dollars in cash and charge slips missing. An employee time clock was broken, a

cigarette vending machine was destroyed, and the premises were generally vandalized.

The cigarette machine stood at the bottom of the stairwell in an area partitioned for it. Mike Brandon, a co-assistant manager, testified that on his arrival the next morning he found the door to the cigarette machine hanging open, a few coins lying in the bottom of it, and the lock torn open so it could not be closed back. In describing what he saw at about 11:15 a.m. on the same day, Captain Arlie Isaacs of the Boone Police Department said that the "cigarette machine was, had been beaten open with the door standing open."

Captain Isaacs, an expert in lifting and comparing fingerprints with thirteen and one-half years' experience, made numerous lifts of latent fingerprints. Latent fingerprints taken from the damaged cigarette machine at 12:20 p.m., 21 November 1982, matched those of defendant Reilly, according to the testimony of Captain Isaacs and S.B.I. Special Agent Navarro, also a fingerprint expert. Captain Isaacs also testified that there were no similarities between the latent fingerprints identified as being made by Mr. Reilly and the fingerprints taken of other employees.

Captain Isaacs obtained impressions of the actual fingerprints of Mr. Reilly from him on 21 December 1982. Mr. Reilly was arrested on 31 December 1983. The Miranda warnings were fully given.

Since the defendant at trial contended that his fingerprints were lawfully placed on the machine, the following quote from Captain Isaacs' testimony was extremely incriminating:

> He [defendant Reilly] stated that my fingerprints couldn't have been on the machine because I had no damn business around the machine, I don't smoke and I don't use matches.

Pinpointing the location of the fingerprints found on the cigarette machine was also crucial in this case. The machine was actually in the courtroom and observed by the jury. Captain Isaacs was asked: "Would you show the Jury where you found the prints, sir." After stepping down to the machine, Isaacs said:

I first dusted the outer area of the machine, outer structure and not finding anything of value; *come down through the inside area of the cigarette machine, and dusted the, this portion here (pointing) which is obvious.* I lifted approximately four fingerprints of value from this side of the cigarette machine. (Emphasis added.)

On another occasion Isaacs said that the prints were "lifted from the metal portion of the inside of this machine over here." Other answers of Isaacs revealed that the prints he lifted would have been placed there within forty-eight hours and that "at the end of sixty hours then the print would begin to deteriorate." The lifted latent prints matched the defendant Reilly's right index, middle, and little fingers.

The defendant offered evidence. The defense was alibi. On that evening Reilly said he went bowling, visited with a friend, watched two movies on TV, returned home about 12:30 a.m., and went to bed. These events were corroborated by several witnesses.

The defendant argues that his fingerprints were affixed to the cigarette machine in a lawful manner and at a time other than the time of the crime. As janitor he had vacuumed under and around the machine. He testified that he was in the habit of inserting his hand into the machine's vending slot in order to obtain matches to light the wood stove located in his home. It was verified that the defendant had a wood stove.

The vending machine was so programmed that when someone purchased a pack of cigarettes the machine would also dispense a pack of matches if the purchaser pressed a separate button to obtain them. If the customer failed to press the button and take his matches from the slot, the next person [whether customer or stranger] to press the matches button would get free matches without making a purchase. Mr. Reilly was aware of this feature and said he used this knowledge to keep himself supplied with matches.

Mr. Randy Greer, owner of the cigarette machine, testified that the machine had "trips" that turn and "throws them [matches] straight down and hit here and they fall in the tray," which is the same tray that the cigarettes fall into. Both cigarettes and matches are removed by hand from the same tray.

During his direct examination Mr. Reilly testified that he had pushed the matches button to the cigarette machine many times, and that he had touched the interior of the machine. When specifically asked, "Do you recall a specific time when you put your hand in the machine?", his response was, "No, I do not."

[2] Was this evidence sufficient to withstand a motion to dismiss or for nonsuit? Under the standard for our review reiterated in *State v. Brown*, 310 N.C. 563, 566, 313 S.E. 2d 585, 587 (1984), we hold that there was substantial evidence of each element of the offenses charged, that there was substantial evidence that the defendant was the perpetrator of the crimes, and that the motion to dismiss was properly denied. *State v. Bradley*, 65 N.C. App. 359, 309 S.E. 2d 510 (1983). Such contradictions and discrepancies, as championed by defendant, in the evidence were solely for resolution by the jury. As said in *Brown, Id.*,

> It is well settled that upon a motion to dismiss in a criminal action, all the evidence admitted, whether competent or incompetent, must be considered by the trial judge in the light most favorable to the State, giving the State the benefit of every reasonable inference that might be drawn therefrom. Any contradictions or discrepancies in the evidence are for resolution by the jury. *State v. Witherspoon*, 293 N.C. 321, 237 S.E. 2d 822 (1977). The trial judge must decide whether there is substantial evidence of each element of the offense charged. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State v. Smith*, 300 N.C. 71, 78, 265 S.E. 2d 164, 169 (1980).

We also specifically hold that the evidence was sufficient to support a conviction on the use of Mr. Reilly's fingerprints found at the scene of the crime. In overruling nonsuit the trial court announced it based its ruling on the law in *State v. Miller*, 289 N.C. 1, 220 S.E. 2d 572 (1975). In *Miller* the defendant was convicted of breaking, entering and larceny of a launderette, and the defendant's thumbprint was found on a vending machine lock. When questioned about the print the defendant denied he had ever been in the launderette.

We feel that the law on fingerprint evidence in relation to our scope of review is best summarized in *State v. Bass*, 303 N.C.

267, 272, 278 S.E. 2d 209, 212-13 (1981) wherein the Supreme Court lists numerous cases, including *Miller, supra,* in which it has considered the sufficiency of fingerprint evidence to withstand dismissal. The developed rule establishes that

> when the State relies on fingerprints found at the scene of the crime, in order to withstand motion for nonsuit, there must be substantial evidence of circumstances from which the jury can find that the fingerprints could have been impressed only at the time the crime was committed. As stated in *State v. Miller, supra,* and quoted in *State v. Scott,* [296 N.C. 519, 251 S.E. 2d 414 (1979)]:

> > These cases establish the rule that testimony by a qualified expert that fingerprints found at the scene of the crime correspond with the fingerprints of the accused, when accompanied by substantial evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed, is sufficient to withstand motion for nonsuit and carry the case to the jury. The soundness of the rule lies in the fact that such evidence logically tends to show that the accused was present and participated in the commission of the crime.

An analysis of our evidence when placed against the *Bass* rule establishes that there was unequivocal testimony by Captain Isaacs that Mr. Reilly's fingerprints were found at the scene of the crime, and through the testimony of both Isaacs and Agent Navarro, the crime scene fingerprints positively corresponded with Mr. Reilly's fingerprints. There was substantial evidence from which the jury could find that Mr. Reilly's fingerprints could only have been impressed on the cigarette machine at the time of and during the crime, as illustrated by these circumstances:

(1) The prints were found and lifted from the inside of the machine.

(2) The prints were "fresh," placed on the machine within approximately 24 to 48 hours, and would have begun to deteriorate after 60 hours.

(3) The defendant had not been employed at the restaurant since 11 November 1982. The crime occurred during the

night of 20/21 November 1982. There is no testimony that the defendant touched any part of the cigarette machine for any reason on 11 November 1982 or on the morning of 19 November 1982 when he picked up his last check and performed the chore of removing rainwater containers.

(4) The defendant denied at the time of arrest: "[M]y fingerprints couldn't have been on the machine because I had no damn business around the machine, I don't smoke and I don't use matches."

(5) There were no similarities between the latent prints identified as defendant's and the fingerprints taken from other employees.

(6) There is a failure in the evidence to establish a specific time or occurrence when the defendant's fingerprints could have been lawfully impressed. [Q. "Do you recall a specific time when you put your hand in the machine?" A. "No, I do not."] There is no evidence specifically indicating that the defendant took matches from the machine or touched any part of the machine at any time prior to the crime itself, or before or after he was fired.

Furthermore, the defendant was a former employee fired for missing a day's work and the restaurant's employee time clock was one of the items vandalized. These circumstances, singly and collectively, logically tend to show that Mr. Reilly was present and participated in the crimes. Upon this evidence it fell within the province of the jury to determine credibility and to decide what the evidence proved or failed to prove.

Unlike in *Bass*, Mr. Reilly has offered no explanation for the "fresh" fingerprints found at the scene of the crime which, if true, would exculpate him. The defendant's explanation for the prints — that he must have at some time placed his hand in the machine and removed matches — was presented to the jury by his evidence, and was rejected, as lay within the jury's right. Contrary to the appellant's brief, our record and transcript do not say that the lifted latent fingerprints came from the inside of the metal tray that holds the matches as they are dispensed, and which tray is accessible to any stranger from the outside of the machine.

[3]   We now turn our attention to the question of whether "plain error" was committed when the trial court refused to give a special instruction on fingerprint evidence. We find no such error. Our result is the same conclusion reached by our Supreme Court in *State v. Odom, supra,* when it originated the rule in its discussion of the application of Rule 10(b)(2) of the Rules of Appellate Procedure concerning jury instructions. As of this writing we are unaware of any decision in our North Carolina Supreme Court which has found plain error to exist. By the *Odom* case all appellate courts were informed that plain error was to be applied only "in the exceptional case where, after reviewing the entire record, it can be said that the claimed error is a 'fundamental error.' " *Id.* at 660, 300 S.E. 2d at 378 (citation omitted). Plain error must fall within these areas:

(1) a fundamental error, meaning " 'something so basic, so prejudicial, so lacking in its elements that justice cannot be done.' " *Id.* or

(2) a grave error, which must amount " 'to a denial of a fundamental right of the accused,' " *Id.,* or

(3) the error has " 'resulted in a miscarriage of justice,' " *Id.,* or

(4) an error that denies appellant of " 'a fair trial,' " *Id.,* or

(5) an error that " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,' " *Id.,* or

(6) "where it can be fairly said that 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' " *Id.*

There were no requests for any special instructions on fingerprints and the trial judge gave none. The record shows that the opportunity to present same was specifically given before the charge to the jury began. The record further shows, in accordance with Rule 10(b)(2) of Appellate Procedure, that opportunity was given the defendant [and the State] at the conclusion of the charge to make objections out of the presence of the jury. No objections were made. The consequence is that the defendant is "precluded . . . from assigning as error any portion of the jury charge." *State v. Bennett,* 308 N.C. 530, 535, 302 S.E. 2d 786, 790 (1983).

The allegedly omitted instruction on fingerprints is not included in the defendant's brief. We are left to speculate as to what the defendant now contends the trial judge should have said. The appellate court is not required to supply the words for an omitted special request for an instruction. However, in turning to the motion for a suspension of the rules mentioned earlier, we garner that appellate counsel now contends that the trial court should have said words to this effect:

> that before you, the jury, can return a verdict of guilty, you would first have to find that the fingerprints of the defendant could only have been impressed at the scene of the crime at the time the crime was committed.

We hold that the alleged omitted jury instruction deals solely with a subordinate feature of the case. *State v. Bradley, supra.* As pointed out by Chief Judge Vaughn in *Bradley,* "Defendant's requested instruction [*i.e.* 'that fingerprints corresponding to those of the accused were without probative force unless the circumstances showed that they could have only been impressed at the time the crime was committed,' *Id.* at 363, 309 S.E. 2d at 513] concerned a subordinate feature of the case since it did not relate to the elements of the crime itself nor to defendant's criminal responsibility therefore." *Id.* A trial judge, absent a special request, is not required to charge on fingerprints. Knowledge of the existence of fingerprints may be used as evidence and may constitute a part of substantial substantive evidence without converting the subject of fingerprints from being a subordinate feature of the case. Whatever defendant's reliance upon *Bradley* may be, it is misplaced. In *Bradley* the error was in failing to give a specific, special instruction on fingerprints which had been appropriately requested. In *State v. Ward,* 300 N.C. 150, 155, 266 S.E. 2d 581, 585 (1980), a murder case, our Supreme Court emphasized that "the judge is not required to instruct the jury as to evidentiary matters essentially 'subordinate,' *i.e.* those which do not relate to the elements of the crime charged or to defendant's criminal responsibility." *Also see State v. Small,* 293 N.C. 646, 239 S.E. 2d 429 (1977), wherein it was not prejudicial error to fail to charge on testimony concerning the victim's blood type since this did not concern a substantive feature of the case.

We hold it is not plain error to fail to give an unrequested instruction on fingerprints in the judge's charge to the jury. In

reaching our conclusion we have examined the entire alleged in-
structional error and hold that its absence had no probable impact
in the jury finding of guilt, and that the defendant has failed to
bring himself within any of the arms of protection of the *Odom*
rule.

[4] Further, we hold that the defendant was not denied the ef-
fective assistance of counsel by a failure of counsel to submit pro-
posed jury instructions. *State v. Davis*, 66 N.C. App. 137, 142, 310
S.E. 2d 424, 427 (1984). It is the duty of the trial judge to prepare
appropriate instructions to the jury, and the judge must "fully in-
struct the jury on all substantial and essential features of the
case embraced within the issue and arising on the evidence . . .
[and] may in his discretion also instruct on the subordinate and
nonessential features of a case without requests by counsel."
*State v. Harris*, 306 N.C. 724, 727, 295 S.E. 2d 391, 393 (1982). The
failure of trial counsel to submit a request for jury instructions on
fingerprints, a subordinate feature, is not ineffective assistance of
counsel.

The record before us shows that defense counsel at trial was
very good; he cross-examined vigorously, made numerous motions
and objections which resulted in some favorable rulings, and put
on a strong alibi defense. A mere reading of the transcript shows
that trial counsel gave defendant "the representation of a skilled,
capable, intelligent lawyer who handled his case in a manner con-
sistent with the highest traditions of the legal profession." *People
v. Eckstrom*, 43 Cal. App. 3d 996, 1003, 118 Cal. Rptr. 391, 395
(1974). In accordance with our application of the principles of
*Strickland v. Washington*, --- U.S. ---, 104 S.Ct. 2052, 80 L.Ed.
2d 674 (1984), to the representation of counsel at trial on the mo-
tion for appropriate relief for alleged ineffective assistance, we
hold that trial counsel did render reasonably effective assistance,
and that there is no reasonable probability of a different result
had trial counsel performed differently, nor is there a showing of
a reasonable probability of a different result with "effective"
assistance. Mr. Reilly has failed to show that his "counsel's
representation fell below an objective standard of reasonable-
ness." *Id.* at ---, 104 S.Ct. at 2065, 80 L.Ed. 2d at 693.

[5] The remaining issue, involving the proper scope and limits of
cross-examination for impeachment of credibility of alibi wit-

nesses into religious beliefs and affiliation with a particular religious group, arises from the third question presented for review. We hold that the trial judge properly allowed the State to impeach the credibility of the defendant's alibi witnesses by a showing of bias, interest and motive.

Four alibi witnesses testified concerning the activities and whereabouts of the defendant on the night in question. All said he was elsewhere than at the scene of the crime. All these witnesses, as did the defendant, belonged to a religious group called The Way International. This common bond was brought out on cross-examination. Representative excerpts follow.

Of the witness Karen Nelms, on cross-examination she was asked, "Do you contribute your wages [from work at the Pizza Hut] to The Way?" She answered that she did not give her wages but gave "[t]en percent or what I have [or] [w]hat I can give of that." There was no objection to any of this line of questioning.

To Mr. Reilly, defendant, on cross-examination, answered, over objection, that he knew that Karen Nelms "abundantly share[d]" her wages from her work at the Pizza Hut.

To Karen Nelms, on rebuttal on cross-examination, this time over objection, she again answered that she "abundantly share[d]" her wages from her work at the Pizza Hut when she had money to give.

To Mr. Reilly, on cross-examination, he was asked, "What happened to the money you all take up there in your fellowship hall?" His reply was, "It goes to The Way International." No objection was lodged. Thereafter, an objection was overruled to a question asking the witness if he knew to whom the money went. The response was that it went to Howard Allen, the treasurer of The Way International in New Knoxville. It was immediately following this that Mr. Reilly volunteered the answer that they called the taking care of money "Abundant Sharing." This was followed by further cross-examination of abundant sharing without any objection.

The defendant now contends that the most damaging portion of the improper cross-examination dealt with the testimony of the father of Karen Nelms, Mr. Delton Nelms. It appears that Mr. Nelms had sent his daughter Karen to a deprogramming center

and had paid approximately $19,000 to $20,000 for it. The defendant now contends that the testimony transferred the trial into a "cult case."

When Karen was being cross-examined for the first time, she was asked: "You've been in a deprogramming center?" Before answer, counsel objected, moved to strike, and moved for a mistrial. After a discussion in the absence of the jury the court overruled the objection (although the specific question was never answered) and denied the motion for mistrial for the reasons that the State was entitled to attack credibility and to show bias or prejudice. The prosecutor also stated that he intended to put the father, Mr. Nelms, on the stand to attack credibility, which he subsequently did on rebuttal. Upon the return of the jury the court instructed them to "consider this evidence only if it bears on the credibility of the witness and for no other purpose whatsoever."

When again before the jury, Karen Nelms testified that she did not go to a center but to a house and that her parents had deprogrammers flown in. We hold this cross-examination was proper in leading to the next question and line of questions, to which there were no objections or exceptions, and which were essential to pave the way for the use of Karen's father as a State's rebuttal witness. These questions lead to the heart of impeachment of the credibility of Karen.

> Q. Did you tell your father at that place that you were not with David Reilly on the night of 20 November, but that you intended to come here and say that you were anyway?
>
> A. No, sir.
>
> Q. You did not tell him that?
>
> A. No, I did not.

Subsequently, on rebuttal for the State, Mr. Delton Nelms, Karen's father, testified. During a voir dire as to competency, requested by defense counsel, the court said he would allow Mr. Nelms to testify for the sole purpose of impeaching the credibility of Karen Nelms, and he gave an appropriate instruction upon the jury's return.

The substance of Mr. Nelms' rebuttal testimony shows that he and Karen were having a general discussion at a friend's house [*i.e.* the deprogramming house, although during the voir dire counsel had agreed not to use, and did not use, the word again in the presence of the jury]. A narration follows:

> We were having a general discussion . . . [a]bout what one of the boys had been charged with, I believe breaking and entering or something like this, and . . . I was asking was she involved with it. . . . [S]he told me that he didn't do it. . . . I asked her . . . how do you know he didn't do it, she said he told me he didn't do it. . . . [S]he told me she was intending to testify . . . [b]ecause she believed what he said. . . . *She told me she was not with him, but that she would testify . . . [b]ecause she believed he was not there*, he told her that he was not there and he didn't do it. (Emphasis added.)

We note that Anita Reece was the first defense witness. During her cross-examination she stated that Mr. Reilly, Pat Yacongis, Lee Metzger, Mark Edwards, Karen Nelms, and herself were all members of The Way and that all were about to testify for the defendant. The defendant did not object to this testimony. When asked to "tell us something about The Way Incorporated," she did so, and explained that "[i]t's a ministry on Biblical research, it teaches you about the Bible." This explanation was followed by five pages of testimony which involved the local and national organization, drawing no objection or exception from the defendant. A reading of the transcript of the testimony of the defendant's other witnesses shows that the general subject matter of The Way became a part of either their direct or cross-examination and to which no objection was made.

Collectively, the testimony of the defendant's alibi witnesses tended to corroborate his own testimony that he was with various members of The Way during the night of 20 November, and after the midnight hour stayed at the house of The Way fellowship. Such testimony tended to preclude Mr. Reilly's participation in any crime on 20/21 November. Thus, a showing of a special relationship between the witnesses and the defendant formed a part of the defense of alibi. Their interest or bias as fellow members of the same group was therefore open to cross-examination to impeach their credibility and was relevant and within the scope of

approved cross-examination. *See* 1 Brandis, on North Carolina Evidence, Sec. 45 (1982). This section reflects the principles of law that the bias of a witness for a party is a circumstance to be considered in appraising the credibility and weight of his or her testimony, and that the existence of bias may be shown by the relationship of the witness to the party or his cause or by particular occurrences from which bias may be inferred. Brandis then states that

> Precise limits on the range of circumstances from which bias may be inferred are neither possible nor desirable. To be admissible the evidence must tend to prove something which, rationally or in common experience, might induce the witness to falsify or to color the truth. If its only effect will be to play upon local prejudices, its admission is error. If it tends only slightly to prove bias, it may be admitted for what it is worth . . . . *Id.* at 171.

The trial judge is given discretion to control the cross-examination. *Id.*

> As to questioning about religious beliefs Brandis reports that

> It has not been definitely decided whether, for impeachment purposes, a witness may be cross examined as to his religious beliefs; but such cross-examination should be confined to situations in which religious affiliation might indicate bias or adherence to a particular "religious" tenet could, in the circumstances, rationally raise a substantial doubt as to credibility—in other words, to situations in which potential unreliability is suggested by common sense, as distinguished from prejudice attributable to doctrinal differences between witness and jurors. *Id.* at Sec. 55.

Appellate review of the trial judge's rulings upon objections duly made is for a clear abuse of discretion or erroneous application of the law. *Id.* at 206.

> While our case was tried prior to 1 July 1984, the date the new Rules of Evidence for North Carolina courts became effective, we feel that G.S. 8C-1, Rule 610 helps clarify, but does not change, prior law. This rule provides:

> > Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing

that by reason of their nature his credibility is impaired or enhanced; provided, however, such evidence may be admitted for the purpose of showing interest or bias.

In their comment upon the federal counterpart of Rule 610, Crotchett and Elkind in Federal Courtroom Evidence, 92.5 (1984), say that an "inquiry into the religious beliefs . . . of a witness for the purpose of showing . . . interest or bias because of them is not within the prohibition" of the rule, foreclosing this line of questioning.

In his brief the defendant noted that "[t]rial counsel observed in this case how *possibly* permissible limited cross-examination on bias was converted into a community scandal involving a religious cult, deprogramming, and recruiting of local membership," (emphasis in original), and contends that the State used evidence of religious affiliation to try the witnesses and the defendant "for what they believed and attempted to pass on to others." We disagree on the whole record before us. The trial judge did not abuse his discretion in allowing the evidence to be received on the issue of credibility and bias, which two word concepts are intertwined. Rondale's Synonym Finder 101 (1961) lists "preconceived idea" as one of its several synonyms for bias. The testimony of the witness, Karen Nelms, when contrasted with the testimony of her father, fits Karen's disclosure to her father that she had a "preconceived idea" that Mr. Reilly was innocent and that her idea was not based upon any tangible fact, but was based upon a personal relationship with him in The Way. The State properly questioned her about the circumstances. The State's questions were not directed to doctrinal differences between the witness and the jurors. If this group of which the defendant was a member was "not locally popular," as those words were used by Brandis, *supra*, at 205, the record fails to contain evidence to support such an assignment of error on appeal. Counsel's calling this a "cult case" or "an inflammatory inquisition of The Way" does not make it so. Mr. Reilly has failed to show any prejudicial error in the admission of evidence during the cross-examination of any witness. We also point out that the subject of The Way was introduced into the case without any objection, and through some of the witnesses by the defendant's counsel's own examination. We note that when evidence of the same import has been previously,

or thereafter, received without objection, the conduct constitutes a waiver of the later objection.

The results are: the defendant has had a fair trial free from prejudicial error. His convictions stand.

The motion for appropriate relief for ineffective assistance of trial counsel is denied.

The motion to suspend the rules is denied. By virtue of the defendant raising in his brief the issue of plain error, and by virtue of the subject matter of his motion for appropriate relief, the defendant has been accorded appellate review of all of his contentions on fingerprints and jury instructions.

We find no plain error and no prejudicial error.

No error.

Judge WEBB concurs.

Judge EAGLES dissents.

Judge EAGLES dissenting.

The fingerprint evidence, though not clear as to the fingerprints' exact location, is an aspect of the case for the jury's consideration but the defendant is entitled to have the jury consider it only after they have been properly instructed consistent with the mandate of *State v. Bass*, quoted by the majority. Here, the court's instruction did not contain adequate guidance for the jury and that omission constitutes error.

While evidence is unclear from the record on appeal as to the exact place on the cigarette machine where the matching prints were found, it is clear that the fingerprint evidence was the determinative factor in the decision to charge defendant Reilly rather than some other present or former employee. Captain Isaacs testified that he found the critical prints when he was examining the inside of the machine, but their being found on the machine is not inconsistent with defendant lawfully having placed his prints there while reaching and feeling for matches which had been "tripped" but had only fallen part way into the vending machine tray. Defendant, as a matter of habit, obtained matches

from the machine and would have touched an interior area of the vending slot to retrieve a pack of matches which had fallen only part way. Prints placed in such an area would be locatable and capable of being lifted by officers only from the inside of the machine.

Defense counsel, for whatever reason, failed to request the *State v. Bass* instruction, failed to tender a proposed instruction and did not make timely complaint to the trial court about the omission of an adequate fingerprint instruction. No objection or exception appears. Ordinarily, Rule 10(b)(2) would bar appellant from asserting that error here, unless its omission from the trial court's charge amounted to plain error which would excuse the Rule 10(b)(2) violation.

The Supreme Court, in adopting the plain error rule, described it as:

Fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty. *State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983).

The facts here are such that the fingerprint evidence was fundamental and basic, indeed crucial, to the State's case and without the fingerprint evidence to tie defendant to the crime scene at the time in question, the State's case is highly questionable. The instruction omission permitted the jury to weigh the fingerprint evidence without guidance as to the controlling law and clearly had a probable impact on the jury's verdict.

The State contends, and the majority agrees, that the fingerprint evidence here is a subordinate feature of the case. While fingerprint evidence usually may be characterized as a subordinate feature of a criminal case, *State v. Bradley*, 65 N.C. App. 359, 309 S.E. 2d 510 (1983), in the instant case it is the *cornerstone* on which proof of the identity of the perpetrator rests.

State v. Reilly

No other evidence, direct or circumstantial, links defendant to the scene of the crime more closely than anyone else. There were more than four keys which had been in the hands of employees or former employees who could have duplicated them. Employees other than defendant recently had terminated their employment at the victimized establishment.

To say, as the majority does, that the absence of the proper instructions on fingerprint evidence had no probable impact in the jury finding of guilt is, in my judgment, unrealistic and ignores the plain fact that the identification of defendant Reilly as the perpetrator rests on the fingerprint evidence as its keystone, around which the majority has marshalled every other possibly relevant circumstance, however remote. I would hold that the fingerprint evidence is not a subordinate feature of the case but is one on which, under these facts, the trial court should have instructed even without a special request.

North Carolina has approved the doctrine of plain error as an extraordinary relief mechanism to avoid the potentially "harsh results" of Rule 10(b)(2) but has not yet reversed a conviction based on plain error. This case presents a factually appropriate and legally correct occasion to invoke the plain error doctrine to reverse the conviction.

Except as it showed membership in The Way International as a common bond among the defendant's witnesses and defendant and a possible source of bias, the detailed cross examination of the alibi witnesses about the operations of The Way International exceeded the bounds of relevancy. It should not have been permitted to range so far afield. However, it was permitted for the most part without objection by defense attorney. I agree with the majority that whatever error might have occurred in permitting those questions did not amount to an abuse of the trial court's discretion and was not of the magnitude to merit a new trial, nothing else appearing.

Notwithstanding the lapses of trial counsel in failing to suggest and tender a fingerprint instruction, failing to object and except to its omission and failing to object to the irrelevant portions of the cross examination of defendant's alibi witnesses about The Way International, I would concur in the portion of the majority opinion which denies the motion for appropriate relief for ineffec-

tive assistance of counsel. In summary, I would vote to reverse the conviction and award a new trial based on the trial court's failure to properly instruct the jury as to its consideration of fingerprint evidence.