## STATE v. RALPH CONNOR AND SINCLAIR CONNOR.

(Filed 5 May, 1920.)

**1. Conspiracy—Homicide—Evidence—Common Law—Circumstantial Evidence.**

A conspiracy among several, resulting in a murder in the first degree may be shown by circumstantial evidence, or implied from the words and conduct of the parties or the previous facts and circumstances leading up to the killing, making all equally guilty with the one committing the act, and it is not necessary that the parties entered at the same time therein or had expressly agreed thereon.

**2. Same—Arrest—Murder—Trials—Questions for Jury.**

Where two brothers knew that the sheriff was present to arrest one of them for a criminal offense and before the act both had declared themselves armed with pistols and that the arrest should not be made, and at the time of the attempted arrest the sheriff showed his warrant and was fired upon by the one named therein and the other, knowing the circumstances pressed forward through the by-standers with threatening words and drawn pistol and deliberately fired upon and killed the sheriff. *Held*, the evidence is sufficient of a conspiracy, or the previous meeting of the minds of the prisoners in a common design to kill, and proper for the determination of the jury upon the question of murder in the first degree.

**3. Instructions—Reading from Decisions—Generalities—Abstract Propositions.**

Where the trial court reads from a decision of the Supreme Court of this State applicable in principle to the one being tried, without adopting the facts therein, but applies it to the evidence, it is not objectionable as a glittering generality or an abstract proposition. *S. v. Jones*, 87 N. C., 547, cited and distinguished.

**4. Instructions—Narrative of Facts—Expression of Opinion.**

Where the trial court properly applies the principles of law applicable to the evidence in the case, his statement of the testimony to the jury, telling them it was only to refresh their memory and that they must be guided by their own recollections, cannot be held objectionable, as an expression of opinion.

**5. Conspiracy—Criminal Law—Trials—Questions of Law—Questions of Fact—Instructions—Homicide—Murder—Declarations.**

In an action for conspiracy resulting in a homicide, it is for the court to determine whether the conspiracy has been sufficiently shown for the evidence to be considered by the jury, but when it is, it is correct for the judge to instruct them that if they so found, the act done by one of them in furthering the unlawful design, is the act of all, and declarations made by one, at the time, is to be considered against all.

**6. Conspiracy— Criminal Law — Arrest— Degrees of Murder— Intent— Statutes—Instructions.**

There being evidence of conspiracy on a trial for a homicide that the defendants, being brothers, R. and S., had armed themselves with pis-

tols, for the declared purpose of preventing the arrest of one of them, S., under a warrant, by the sheriff, with threats to kill; that the one to be arrested, S., fired upon the sheriff, but the sheriff, slightly wounded, shot him in return, and the other, R., hearing the shot, pressed forward through the by-standers, who tried to detain him, declaring he would kill the man who shot his brother, and fired into the sheriff from behind and killed him; *Held*, a charge was correct that, as to defendant R., the jury could render a verdict either of guilty of murder in the first or second degree or not guilty; and as to S., guilty of murder either in the first or second degree, or guilty of an assault with deadly weapon with intent to kill (Laws of 1919) ; and as to both defendants, that if they entered into a conspiracy merely for the purpose of resisting an officer, but not with the intent to kill, they would be guilty of murder in the second degree.

APPEAL by prisoners from *Adams, J.,* at October Term, 1919, of IREDELL.

The prisoners were convicted of the murder in the first degree of Lloyd Cloaninger, who at the time of the killing was deputy sheriff of Iredell. The deceased, under a warrant from a justice of the peace, was commanded to arrest Boizy Conner and one of the prisoners, Sinclair Conner, under a charge of assault with a deadly weapon upon one Farin. On Sunday, 3 August, 1919, a large crowd of negroes, and some whites, were attending a camp meeting at Morrow's Grove, a negro church. Among these were the prisoners, Ralph Conner and Sinclair Conner, and their brother, Boizy Conner, the last two being defendants in said warrant, and all three it seems armed with pistols. The deceased officer, accompanied by two other officers, Furr and Broom, of Mooresville, went to the camp meeting ground about 3 p.m. to serve the warrant against Sinclair Conner and Boizy Conner. Before the actual attempt to serve the warrant both of them were informed that the officers were in search of Sinclair to arrest him, and both were armed with pistols. Sinclair, inquiring where the officer was, went toward Cloaninger and asked him: "What in the hell does all this mean?" The deceased, Cloaninger, having the warrant in his hand, told Sinclair, "You are under arrest; be quiet," to which Sinclair replied: "No God-damned man shall arrest me!" Then, crouching behind a tall black negro he drew his pistol and opened fire upon Cloaninger. Cloaninger returned the fire. The only wound that Cloaninger seems to have received at this time was a slight one in one of his arms, whereas Sinclair Conner was so badly wounded that after dodging behind an automobile he fell at the foot of a tree some distance off. Cloaninger and the two other officers followed him to the tree, where Cloaninger was trying to ascertain the extent of Sinclair's wounds, and to get a car to take him to some physician for attention. While this was going on,

48—179

Boizy Conner came up and attacked Cloaninger, but without a weapon. Cloaninger used a blackjack in defending himself from the attack of Boizy. Furr and Broom, the other officers, then seized Boizy, and while they were holding him Ralph Conner, the other defendant, breaking through the crowd which was trying to restrain him, and declaring that he would kill the damned white man who had shot his brother, came up behind Cloaninger and fired two shots into his body. One of these shots was not fatal; the other, that which passed through Cloaninger's bowels, was the cause of his death." Testimony of H. C. Furr; of Dr. Henry Long; Johnson Gabriel. Miles Wilson testified: "I was at the camp meeting on 3 August; walked there between 12 and 1 o'clock. I saw Sinclair and Ralph Conner as I was going; they were on the road between church and the woods, about 100 yards from the church. There were four of them abreast together, Sinclair, Ralph, Boizy, and another fellow with uniform shirt and blue pants—I didn't know him. They were talking when they passed me, and went around right in front of me up to the church. I was going up to the camp ground; they were going along in front of me, and I heard them say—Sinclair said, 'I don't intend to be arrested by any damned man, white or anybody.' Said, 'I have got as good a gun as any man ever shot.' And Ralph said, 'Yes; and I have got as good a gun as any man, and I will use it if I have to.' "

John Wally testified: "I was at George Mayhew's on 3 August, and was at the camp ground that morning about 11 o'clock. I saw Sinclair Conner there, walking around through the crowd. There was a soft drink stand there, and Sinclair came up and made a remark about the sheriff. Some other fellow walked up when he came—they were getting dopes, Sinclair among them. Ralph and Boizy came up and called to him, and he left."

And again: "It was a few minutes after 4 o'clock when I saw Sinclair, Ralph, and Boizy at the soft drink stand. I went to Mr. Mayhew's and got dinner and was at the dope stand at 4 o'clock. The dope stand was three or four hundred yards from the camp ground. While I was standing there, Sinclair came up and asked something about the sheriff, and somebody said, 'There is the sheriff over there,' and he said, 'No; that is a boy; he can't arrest me. I am talking about the big sheriff.' And after he made this remark, Ralph and Boizy came up, called to him as they started off, going in the direction of the preaching stand; I heard them murmuring; I could not understand what they said as they went off, about three or four hundred yards, and about 4 or 5 o'clock I heard the report of the pistol."

The State relies upon this evidence of Wally as particularly important under the question of conspiracy. It places the three brothers together after Sinclair had the deceased pointed out to him, and declared that he would not be arrested.

Dick Craven, after testifying in regard to the first gunfiring between Sinclair and the deceased, proceeded: "When they finished they backed so that I could sorter see Cloaninger, and the other fellow went back behind my machine, went down to some trees, and another negro on my other side attracted my attention. He said, 'That is my brother; they can't arrest him!' He was about ten feet away (then he says he was fifty feet). He was pressing on with the crowd with a pistol in his hand. Four or five old colored women were holding him; he was pressing on and telling them, 'Get back or I will shoot!' He advanced further on and another colored man got between them, and he said, 'Get out of my way! This is my brother; they cannot arrest him!' He was using profane language. He said, 'God damn, get out of my way! That is my brother; nobody can take him!' He said, 'I have a 13-shooter and will use it!' And everything that got in his way, he made get out of his way—had the pistol in his hand. He was moving, advancing all the time, going down the way he saw Cloaninger—down there where this other fellow fell."

The evidence is that this other negro was the prisoner, Ralph Conner. There was a verdict of guilty of murder in the first degree as to both prisoners, and the capital sentence was imposed by the judge, from which both appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*L. C. Caldwell, E. B. Jones, and R. T. Weatherman for prisoners.*

CLARK, C. J. The prisoners declined to introduce any testimony. There are 12 assignments of error to the charge, and 6 to the testimony. The exceptions, broadly speaking, present two contentions for the prisoners: 1. That there was no sufficient evidence of a previous conspiracy between the prisoners to compass the death of the deceased. 2. That there was no sufficient evidence to submit to the jury, independent of that concerning the conspiracy to murder, against the defendant Ralph Conner.

The prisoners' exceptions 1, 2, 3, 4, 5, and 6 are all based on the theory that there was no evidence of such conspiracy. All these exceptions are to the admission or exclusion of testimony. Assignment of error 1 is that the judge, in charging and defining what is a conspiracy in law, said: "It is not necessary to constitute the offense that the parties should have come together and agreed in express terms to unite for a common object. A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense." This is substantially the fifth syllabus in *S. v. Knotts,* 168 N. C., 173. To the same purport, *S. v. Davis,* 177 N. C., 573.

The court then proceeded to incorporate in his charge the following, which he told the jury was a quotation from *S. v. Knotts:* "In this connection I direct your attention to a concise statement of this principle contained in case of *S. v. Knotts,* decided by the Supreme Court of this State. 'As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is complete. This joint assent of minds, like all other facts of a criminal case, may be established as an inference of the jury from other facts proved; in other words, by circumstantial evidence. Individuals who, though not specifically parties to the assault, are present and consenting to the assemblage by whom it is perpetrated are principals when the assault is in pursuance of a common design. There may be no special malice against the parties slain, nor deliberate intention to hurt him, but if the act was committed in the prosecution of the original purpose, which was unlawful, the whole party will be involved in the guilt of him who gave the blow. Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specially agreed upon or understood, each conspirator becomes responsible for the means used by any conspirator in the accomplishment of the purpose in which they are all at the time engaged. It makes no difference at what time any one entered into the conspiracy; it may be, as we have seen, and indeed must be some time before it is fully executed."

The prisoners contend, under the first assignment, that there could not be an implied conspiracy unless there were words or acts to support it, and that they were lacking in this case.

There was evidence that the three brothers were together between twelve and one o'clock, when Sinclair declared he would not be arrested; that he had as good a gun as any man ever shot; and Ralph said: "Yes; and I have got as good a gun as any man, and I will use it if I have to." Then there is testimony that Sinclair was looking up the deceased and swearing as he did so that no man should arrest him; that he opened fire upon the officer almost immediately upon coming into his presence; that Ralph forced his way through the crowd, pistol in hand, swearing and threatening to kill the officer, and coming up behind the officer fired two shots, without notice and without warning, into his body, killing him.

From these facts and circumstances the jury might infer a previous conspiracy or coming together of their minds to kill any officer who attempted to arrest Sinclair. If there was such conspiracy or agreement, both these prisoners were rightfully convicted of murder in the first degree. All six of the assignments to the testimony were based upon the theory that there was no evidence of such conspiracy, and cannot be sustained.

In reading the above excerpt from *S. v. Knotts* as to the definition of conspiracy, the court did not adopt the facts in that case, nor was it a glittering generality, or an abstract proposition of law forbidden by what was said in *S. v. Jones*, 87 N. C., 547, for the judge correctly applied the law to the evidence.

The prisoners' assignments of error 3, 4, and 5 are to the judge's statement of the testimony to the jury. We find no just ground of complaint. He told the jury it was only to refresh their memories, and they must be guided by their own recollection of what the witnesses said. Both before, and thereafter, the judge made the application of the law of conspiracy to the facts as testified to.

Assignments of error 6 and 7 are that the court did not submit the question of murder in the second degree as to Ralph Conner. The court charged the jury, as appears from the record, as follows: "As to Ralph Conner, you may return one of three verdicts—guilty of murder in the first degree, or guilty of murder in the second degree, or not guilty." Assignment of error 8 is to the judge's statement of the law of conspiracy as applicable to the aspects of the testimony in this case, but we find no error therein. His Honor told the jury, "The evidence supporting a conspiracy is generally circumstantial; it is not necessary to prove any direct act, or even any meeting of the conspirators, as the fact of conspiracy may be collected from the collateral circumstances of each case. It is for the court to say whether or not such connection has been sufficiently shown, but when that is done the doctrine applies that each party is an agent for all the others, so that an act done by one, in furthering the unlawful design, is the act of all, and a declaration made by one, at the time, is evidence against all." This is sustained by 2 Whart. Crim. Ev., p. 1432.

In the assignments of error 11 and 12 the prisoners insist that the court was in error to submit the charge of murder in the first degree against Ralph Connor, because there was no evidence.

There was testimony which justified the jury in finding that there was a conspiracy between the prisoners to be inferred and indeed previous to the killing.

On reviewing the entire testimony, if believed by the jury, and which the prisoners did not see fit to attempt to contradict, the deceased and the other officers of the law came with a warrant to arrest the two brothers, Boizy Conner and Sinclair Connor, and both these men and their other brother Ralph were armed, and upon learning of the intention of the officers to arrest them Sinclair declared his intention not to be arrested, and Ralph concurred by declaring also his intention to use his weapon to prevent it; Sinclair fired at the officer, Boizy also came up and attacked the officer, but without a weapon, and when two of the

officers arrested, and were holding Boizy, Ralph Conner, the other prisoner, breaking through the crowd, which was trying to restrain him, came up behind the officer, declaring he would "kill the damned white man who had shot his brother," and fired two shots into his body, killing him. This surely was sufficient evidence, if ever there could be such—of murder in the first degree, and exceptions 11 and 12 cannot be sustained.

The court instructed the jury that as to Ralph Conner they might return one of three verdicts. "Guilty of murder in the first degree; guilty of murder in the second degree, or not guilty." And as to Sinclair Conner, "Guilty of murder in the first degree; guilty of murder in the second degree, or guilty of an assault with a deadly weapon, with intent to kill, in breach of the Act of 1919."

The charge of the court is very full and complete, and presents every reasonable hypothesis in favor of both the prisoners. Besides charging fully as to what constituted a conspiracy, the court instructed the jury: "The State must further satisfy the jury, beyond a reasonable doubt, that said conspiracy between the prisoners was formed and entered into by them prior to the time that the fatal shot was fired. And that if they found, from the evidence, that the prisoner entered into such conspiracy for the purpose merely of resisting the officer, but not to the extent of taking his life, if necessary, the prisoners under the circumstances recited, nothing else appearing, would be guilty of murder in the second degree." In the able charge the judge carefully protected the rights of the prisoners in every aspect, and we find no error as to either of the prisoners.

No error.