STATE OF NORTH CAROLINA v. DONNA JONES ARNOLD

No. 894SC344

(Filed 5 June 1990)

1. **Homicide § 30 (NCI3d) — first degree murder — accessory before the fact — erroneous submission of second degree murder**

    In a prosecution of defendant for first degree murder of her husband as an accessory before the fact, the trial court erred in submitting second degree murder as a possible jury verdict because all of the evidence tended to show a first degree murder based on premeditation and deliberation where it showed that the perpetrator lay in wait and attacked the victim in a church parking lot as the victim returned to the church to retrieve defendant's pocketbook; the victim was stabbed with a scuba diving knife in the chest and his throat was cut; the perpetrator made various statements showing that he had intended for some time to kill the victim; and a controversy existed between the perpetrator and the victim regarding their relationships with each other and with defendant.

    **Am Jur 2d, Homicide §§ 485, 527, 528.**

2. **Homicide § 8 (NCI3d) — use of marijuana — premeditation and deliberation not negated**

    Evidence of the perpetrator's use of marijuana prior to a killing did not negate premeditation and deliberation where there was no evidence as to the effect of the use of marijuana on him at the time of the killing.

    **Am Jur 2d, Homicide §§ 263, 439.**

3. **Appeal and Error § 503 (NCI4th) — error affecting constitutional right — presumption of prejudice — other errors — burden of proving prejudice**

    A defendant is presumed prejudiced by an error affecting a right under the U. S. Constitution, and the burden is on the State to show that the error was harmless beyond a reasonable doubt. If the right affected does not arise under the U. S. Constitution, defendant has the burden of showing that there is a reasonable possibility that, had the error not been committed, a different result would have been reached

at the trial out of which the appeal arises. N.C.G.S. § 15A-1443(a) and (b).

**Am Jur 2d, Appeal and Error § 574; Homicide § 559.**

4. **Homicide § 30 (NCI3d) — first degree murder trial — unsupported submission of second degree murder — violation of due process**

The submission to the jury of second degree murder as a possible verdict when the evidence tends to support only first degree murder violates defendant's federal due process rights.

**Am Jur 2d, Homicide §§ 485, 527, 528.**

5. **Homicide § 30 (NCI3d) — unsupported submission of second degree murder — State's failure to show harmless error**

In a prosecution of defendant for first degree murder of her husband as an accessory before the fact, the State failed to meet its burden under N.C.G.S. § 15A-1443(b) of showing that error by the trial court in submitting second degree murder as a possible verdict was harmless beyond a reasonable doubt where contradictory evidence was presented as to whether defendant procured, counseled or commanded the perpetrator to commit the crime, and it thus cannot be said that the evidence of defendant's guilt of first degree murder was so overwhelming that the jury most certainly would have found defendant guilty of first degree murder had the unsupported offense of second degree murder not been submitted to the jury.

**Am Jur 2d, Homicide §§ 485, 527, 528.**

6. **Criminal Law § 26.9 (NCI3d) — first degree murder trial — unsupported submission of second degree murder — conviction of second degree murder set aside — retrial for first or second degree murder prohibited**

Where defendant was tried for first degree murder and convicted of second degree murder, and the appellate court held that the evidence did not support submission of second degree murder as a possible verdict, the retrial of defendant for first degree murder would place defendant in double jeopardy since a conviction of second degree murder acts as an acquittal of first degree murder; furthermore, defendant may not be retried for second degree murder or any lesser included

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

offense since it has been determined that no evidence of second degree murder exists.

**Am Jur 2d, Criminal Law § 270.**

7. **Homicide § 31 (NCI3d) — second degree murder as an accessory before the fact — conspiracy to murder — verdicts not inconsistent**

The jury did not render inconsistent verdicts in finding defendant guilty of second degree murder as an accessory before the fact and of conspiracy to commit murder.

**Am Jur 2d, Homicide §§ 28, 34-40.**

8. **Criminal Law § 45 (NCI3d) — lay witness — exclusion of demonstration — harmless error**

In a prosecution of defendant for the first degree murder of her husband as an accessory before the fact wherein the State introduced photocopies of purported love letters from defendant to the perpetrator, the trial court erred in refusing to permit a lay witness to testify and submit documents demonstrating how words and phrases from legitimate letters sent by defendant to the perpetrator could have been pieced together and photocopied to produce what would appear to be copies of authentic love letters. However, defendant was not prejudiced by this error since she had already presented evidence to support this theory.

**Am Jur 2d, Evidence §§ 771, 785.**

9. **Criminal Law § 1177 (NCI4th) — conspiracy to murder husband — position of trust or confidence aggravating factor**

The evidence supported the trial court's finding as an aggravating factor for conspiracy by defendant to murder her husband that defendant took advantage of a position of trust or confidence to commit the offense. N.C.G.S. § 15A-1340.4(a)(1)n.

**Am Jur 2d, Criminal Law §§ 598, 599.**

10. **Criminal Law § 1081 (NCI4th) — one aggravating factor outweighing five mitigating factors — no abuse of discretion**

The trial court did not abuse its discretion in finding that one aggravating factor outweighed five mitigating factors in imposing a sentence upon defendant for conspiracy to murder her husband.

**Am Jur 2d, Criminal Law §§ 598, 599.**

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

**11. Criminal Law § 884 (NCI4th)— instructions—waiver of appellate review**

An assignment of error to the court's failure to limit its conspiracy instructions to conspiracy to commit first degree murder will not be considered on appeal where defendant failed to request an instruction, failed to object to that portion of the charge, and failed to argue plain error. Appellate Rules 10(b)(2) (1988) and 10(c)(4) (1989).

**Am Jur 2d, Appeal and Error §§ 545, 623.**

Judge EAGLES dissenting.

APPEAL by defendant from judgment entered 16 March 1988 by *Judge Henry L. Stevens, III* in SAMPSON County Superior Court. Heard in the Court of Appeals 13 October 1989.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*Gerald L. Bass for defendant-appellant.*

GREENE, Judge.

The defendant, Donna Jones Arnold, appeals her convictions of second degree murder and conspiracy to commit murder of her husband Robert Daniel Arnold. The defendant's indictment for murder reads in pertinent part that she "unlawfully, willfully and feloniously and of malice aforethought did kill and murder Robert Daniel Arnold." Her indictment for conspiracy reads in pertinent part that she "unlawfully, willfully and feloniously did combine and conspire with Carl Edward Stuffel to commit the felony of First Degree Murder, G.S. 14-17, against Robert Daniel Arnold." On the murder charge the State prosecuted the defendant on a theory of accessory before the fact of murder.

The principal perpetrator of the murder, Carl Stuffel, pled guilty to second degree murder. Stuffel testified that he was a drug addict and habitual criminal. He began taking drugs when he was ten years old. He has engaged in numerous larcenies and has been convicted of conspiracy to break and enter and felonious possession of a handgun. The deceased, Robert Daniel Arnold (Dan), first met Stuffel on Valentine's Day 1984 at the Valley Style Shop in Raleigh where Stuffel worked as a barber. Stuffel had learned his trade in prison from which he recently had been released.

Stuffel cut Dan's hair and later joined him for dinner. Upon Dan's invitation, Stuffel joined him for that night at a cheap motel where they engaged in a homosexual relationship. In the following weeks, Dan stopped by the shop from time to time to talk to Stuffel, but Stuffel testified that he and Dan did not engage in further homosexual acts. At this time, Stuffel was twenty-two years old and Dan was in his early thirties.

Dan later brought his wife (the defendant) and their two children from their home in Clinton, North Carolina to meet Stuffel in Raleigh. In April 1984, Dan invited Stuffel to Easter Services at Emmanuel Baptist Church in Clinton where Dan acted as Minister of Music. Shortly thereafter, at the end of April, Stuffel moved into the Arnold's house which was close to the church. The defendant testified that she opposed this move because Stuffel was a criminal and a drug addict, and she did not want him in the house with her two little girls. However, at Dan's insistence, she acquiesced in his purported desire to help Stuffel overcome drugs.

A few days before Stuffel joined them, Dan also expressed his desire that the defendant allow herself to be impregnated by Stuffel. Although her initial refusal brought forth Dan's anger and tears, he later agreed to drop the idea. Stuffel testified that the defendant agreed to have a child by him, but that Dan later changed his mind.

On the day that Stuffel moved in with the Arnolds, the defendant confronted Dan with the canceled check with which Dan had paid for the motel room earlier shared with Stuffel. At that time Dan lied to his wife about it, but the next day he gave her a letter in which he not only divulged the details of his relationship with Stuffel, but he also informed her that he had been a homosexual since childhood. He finally admitted to having male lovers wherever they had lived, including Clinton. The defendant testified that she was stunned by these revelations, but she eventually decided that her relationship with Dan was worth working on.

The next day Stuffel began a sexual relationship with the defendant. Stuffel testified that it was voluntary and that they engaged in sexual intercourse about every other day for the next few weeks. The defendant testified that he coerced her to have sexual intercourse three times by threatening to tell the community about Dan's bisexuality and by insinuating threats against her children. The defendant's statements to the police about the nature

of her relationship with Stuffel lend themselves to varying interpretations.

The Arnold household deteriorated such that by May 22, 1984 Dan threw Stuffel out, resulting in an angry confrontation. Stuffel went to Raleigh, but by early June he returned to the Arnolds seeking assistance since he was ill from drug abuse. They took him into their house again briefly, and then at his request committed him to Dorothea Dix Hospital for a month to detoxify. The Arnolds visited Stuffel at Dix together several times a week. Stuffel's therapist at Dix observed that both the Arnolds were frequently engaged with Stuffel in physical contact which he described as a "sexual feeling type of thing." Since their behavior was so inappropriate as to be distracting to other patients, Stuffel's therapist asked them to cease their displays of affection.

The Arnolds planned to entertain Stuffel at their home on a weekend pass from Dix, but on the preceding Thursday Dan called Stuffel's therapist to cancel the plans. Dan told the therapist that the defendant had told him of the sexual relationship between her and Stuffel. Although Dan had been "hysterical, shouting, [and] crying" when calling that night, he called back the next day to say he had changed his mind. Stuffel's therapist, having learned that Stuffel had homicidal ideations about Dan, had encouraged Dan to terminate the Arnolds' relationship with Stuffel. Dan had replied that in spite of the fact that his church told him he would lose his position if he did not give up Stuffel, he did not care. He would work elsewhere rather than terminate the relationship. However, Dan soon changed his mind again, and he brought Stuffel's belongings and car to Dix, telling Stuffel never to return to Clinton. Stuffel was discharged from Dix around July 12, 1984.

Stuffel testified that before his discharge from Dix, he had, at the defendant's request, asked his friend Jerald Junius Tart (Tart) to murder Dan on July 4, 1984. Although Tart purportedly agreed to do so, he did not carry it through because a police officer had noticed him loitering near the Arnold home.

After his discharge Stuffel resided with Tart. Tart and Stuffel had been friends since their teen years. Together they had engaged in various criminal acts. Stuffel testified that a few days after moving in with Tart, they broke into a scuba diving shop, stealing an assortment of equipment including knives and spear guns. According to Stuffel they intended to murder Dan with spear guns,

but after target practice in Tart's yard they deemed the weapons unsuited to the task. Tart swore that he did not participate in Stuffel's burglary of the scuba shop, and that he never had any spear guns at his house. However, Tart's former girl friend testified that Tart and Stuffel visited the scuba shop the day before the burglary, and she saw a spear gun in Tart's closet.

Stuffel testified that he, Tart, and the defendant plotted to kill Dan both before and after Stuffel's release from Dorothea Dix Hospital. By at least July 17, 1984, Dan apparently also plotted to kill Stuffel. On that day he sent a letter to his friend Bill Poole stating that he would kill Stuffel if he thought he could get away with it. Dan asked his friend to contact various drug dealers on a list drawn up by Stuffel in anticipation of Stuffel's assistance to the police. Stuffel intended to aid in the prosecution of these drug dealers to gain a more favorable sentence in a pending firearms prosecution against him. Dan hoped the drug dealers would kill Stuffel. Dan concluded: "I want him [Stuffel] dead and I will not rest until he is." On July 18, while in his church, Dan asked his friend Daniel Staten (Staten) to kill Stuffel. Upon Staten's refusal, Dan informed him that he intended to contact the drug dealers on Stuffel's list so that they would kill Stuffel. Staten discouraged Dan from this pursuit telling Dan that he would more likely end up dead himself.

On the evening of July 18, 1984, Dan and the defendant participated in a service at Emmanuel Baptist Church, after which they returned to their home nearby. Michelle Honeycutt (Honeycutt) joined them to receive a piano lesson from the defendant. Honeycutt testified that during the lesson the defendant sought her contact lens materials to soothe her irritated eyes. Upon discovering that she had left her pocketbook, containing the desired materials, at the church, she informed Dan. According to Honeycutt:

> Dan said he would go back to the church and get her pocketbook, and Donna, she offered first, she said she would go with him, and he said, "no, you say [sic] here and you and Michelle practice," and then she said, "well, I don't have to have it tonight, I have some stuff in the bathroom."

Dan then went to the church by himself anyway. About forty-five minutes later, after making some phone calls trying to locate Dan, the defendant and Honeycutt, with the defendant's children drove to the church. There they noticed on the ground what ap-

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

peared to be the crumpled figure of a man. The defendant began screaming and wanted to get out of the car, but Honeycutt, who was driving, immediately put the car in reverse and pulled away not allowing the defendant to exit. They went to a nearby gas station, called the police and then returned to the scene. The police arrived and found Robert Daniel Arnold dead from numerous knife wounds including a slashed throat.

Stuffel testified that he and Tart killed Dan. He stated that he and the defendant were in love and that she asked him to kill Dan because she feared that a divorce would be too hard on the children. He agreed to kill Dan only because he loved the defendant.

Stuffel further testified that he and the defendant agreed that she would leave her pocketbook at her church on the evening of July 18 and then send Dan for it, giving Stuffel an opportunity to attack. On that evening Stuffel and Tart lay in wait in the woods near the church until Dan appeared. Tart first hit Dan with a slapjack, and then Stuffel stabbed Dan in the chest. Tart then finished Dan off by cutting his throat.

Tart testified that prior to July 4, 1984 Stuffel and the defendant asked him to kill Dan, but he decided not to do so. Regarding the July 18 incident, he admitted bringing Stuffel to a shopping center near the Emmanuel Baptist Church, but he remained in the parking lot until Stuffel's return. Although he claimed not to have known of Stuffel's murderous intent, he admitted to helping Stuffel dispose of a bloody knife and clothing. Tart testified under a limited grant of immunity which required that he testify in the trial of any other defendants of the Arnold murder.

Stuffel admitted that he first implicated the defendant in the murder only on the morning before his plea bargaining. Stuffel's plea bargain required that he testify against the defendant. His sentencing was scheduled for after her trial. In addition, Stuffel testified that he hoped his assistance to the State would gain him the privileges of an "honor" prisoner. Furthermore, he stated that while in custody he came to believe that the defendant only used him to kill her husband since he now believes that she was having an affair with someone else at the time. At the defendant's trial, Stuffel swore that he was finally telling the "whole truth" in spite of the fact that he had lied to the police repeatedly in the preceding months.

The State also produced three xerox copies of love letters purportedly from the defendant to Stuffel. Although none directly implicated the defendant in the murder, they tended to support Stuffel's story of romance. Tart's mother purportedly made these copies from originals she found in Stuffel's belongings. Stuffel later burned the originals. Although no evidence linked Tart's mother to the murder, she had engaged in various criminal acts with Stuffel and Tart, including chauffeuring them around to burglarize houses.

The defendant produced evidence showing that the Arnold home was visible from the shopping center parking lot from which Stuffel had launched his foray against Dan Arnold, thus giving Stuffel an independent opportunity to discern Dan's travels from his house to the church. The defendant also testified that she was not forthcoming to the police about the relationships or incidents between Stuffel, Dan and herself because she wished to protect her deceased husband's reputation in the community. Regarding the xerox copies of the purported love letters, the defendant stated that while the handwriting looked like hers, she had never written letters of that content. A State Bureau of Investigation handwriting analyst concluded that the handwriting could be hers, but could not establish that fact with certainty without viewing the originals. Furthermore, the defendant testified that she had no way of knowing whether Ms. Tart had photocopied original letters or had taken many originals, cut them up and then pasted them together before xeroxing the new compositions. Lastly, the defendant produced numerous character witnesses, including Dan's parents, who testified as to her honesty, generosity, caring and loving nature, her gentleness and peacefulness.

Regarding the murder charge, the trial court instructed the jury that it could (1) acquit the defendant; or (2) find her guilty of first degree murder on an accessory before the fact theory; or (3) find her guilty of second degree murder on an accessory before the fact theory. The second degree murder instruction was made over the defendant's objection. The trial judge stated that he was submitting the second degree murder charge to the jury to be fair to the defendant since Stuffel had an opportunity to plead guilty to that offense. The defendant did not object to the trial court's instruction on conspiracy to commit murder.

Upon the defendant's conviction of second degree murder and conspiracy to commit murder, the trial court found one aggravating

and five mitigating factors for each offense. On the murder charge he sentenced the defendant to fifteen years, and he added ten more years for the conspiracy charge.

---

The issues presented are: I) whether the trial court erred in submitting second degree murder as a possible jury verdict; II) if so, whether the error was prejudicial; III) if so, whether the defendant can be retried for first degree murder or second degree murder; IV) whether the jury rendered inconsistent verdicts by finding the defendant guilty of second degree murder and conspiracy to commit murder; V) whether the trial court erred prejudicially by failing to receive proffered testimony; VI) whether the trial court erred prejudicially by failing to allow the defendant to present demonstrative evidence explaining the source of the xeroxed love letters; VII) whether the trial court erred prejudicially by finding that Stuffel had not waived his Fifth Amendment right to decline to testify; VIII) whether the evidence supported the trial court's finding of mitigating and aggravating factors and the weighing thereof; and IX) whether the defendant's last assignment of error is deemed abandoned for failure to object to the trial court's instructions at trial.

I

[1] The defendant argues that the trial court erred in submitting second degree murder as a possible jury verdict since on the evidence presented the jury rationally could have only either convicted or acquitted her of first degree murder. We agree. The general rule is that:

> [W]here no inference can fairly be deduced from the evidence of or tending to prove a murder in the second degree or manslaughter, the trial judge should instruct the jury that it is their duty to render a verdict of "guilty of murder in the first degree," if they are satisfied beyond a reasonable doubt, or of "not guilty."

*State v. Smith*, 294 N.C. 365, 380, 241 S.E.2d 674, 683 (1978) (quoting *State v. Spivey*, 151 N.C. 676, 685-86, 65 S.E. 995, 999 (1909)). "It is clear then that it is error for the trial court to submit as an alternative verdict a lesser included offense which is not actually supported by any evidence in the case." *State v. Ray*, 299 N.C. 151, 163, 261 S.E.2d 789, 797 (1980).

This same rule applies when the State seeks to prove murder by use of the "accessory before the fact" theory. N.C.G.S. § 14-5.2 (1986) (acting as the "accessory before the fact" is not an independent substantive crime). In using this theory, the State admits it presented no evidence that defendant actually committed the offense, but it seeks to show that another person (the principal) was "counseled, procured or commanded [by the defendant] to commit the offense." *State v. Woods*, 307 N.C. 213, 218, 297 S.E.2d 574, 577 (1982). Under the "accessory before the fact" theory, the degree of defendant's guilt is identical to that of the principal. N.C.G.S. § 14-5.2. In this context, it is error to allow the jury to find the defendant guilty of second degree murder when no inference can fairly be deduced from the evidence tending to prove that the principal committed murder in the second degree. *See Smith*, 294 N.C. at 380, 241 S.E.2d at 683.

Our inquiry therefore is whether there was evidence from which a jury could reasonably have found the principal, Stuffel, guilty of second degree murder. Since the trial court did not instruct the jury on "lying in wait," as a basis for first degree murder, *see State v. Johnson*, 317 N.C. 193, 203, 344 S.E.2d 775, 781 (1986) (premeditation and deliberation are not elements of murder in the first degree where the murder is committed by "lying in wait"), it would not have been error to submit second degree murder to the jury if there was evidence, reasonably construed, tending to negate Stuffel's premeditation and deliberation. *See State v. Strickland*, 307 N.C. 274, 287, 298 S.E.2d 645, 654 (1983).

In determining whether a killing was committed with premeditation and deliberation, some of the relevant factors are:

(1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased had been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner.

*State v. Barts*, 316 N.C. 666, 687-88, 343 S.E.2d 828, 842 (1986). "[T]he nature and number of the victim's wounds is [also] a circumstance from which premeditation and deliberation can be inferred." 316 N.C. at 688, 343 S.E.2d at 842.

We conclude that the evidence reasonably construed indicates a coldly calculated killing planned well in advance, and it belies anything other than a premeditated and deliberate killing. All the evidence shows that Stuffel lay in wait in the woods near the church and attacked him in the parking lot as the decedent was returning to the church to retrieve his wife's pocketbook. Decedent was stabbed with a scuba diving knife in the chest and his throat was cut. The record is full of statements made by Stuffel that he had for some time intended to kill the decedent. Stuffel had even acquired spear guns specifically to accomplish the crime although he decided not to use them. Likewise the record is replete with evidence of controversies existing between Stuffel and the decedent, regarding not only their relationship with each other but also their relationship with the defendant. Noticeably absent from the record is any evidence of bruises, cuts or scrapes incurred by Stuffel as would be characteristic of an unpremeditated fight. Finally, Stuffel's disposal of the knife after the killing indicates "prior careful thought in planning to hide the killing." *See State v. Cummings*, 326 N.C. 298, 317, 389 S.E.2d 66, 77 (1990).

[2]   The State argues the fact that Stuffel smoked marijuana prior to killing is evidence negating premeditation and deliberation. We disagree. A defendant's use of drugs or alcohol negates deliberation and premeditation only when there is evidence that the "defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *State v. Medley*, 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978). As there is no evidence in the record relating to the effect of the use of marijuana on Stuffel at the time of the killing, the evidence of the use of marijuana does not negate premeditation and deliberation.

Accordingly, we determine that the State adequately established all the elements of first degree murder based on premeditation and deliberation and that there is no evidence in the record sufficient to cause a "rational trier of fact to doubt" the State's proof of these elements. *See State v. Clark*, 324 N.C. 146, 165, 377 S.E.2d 54, 65 (1989). "The mere possibility that the jury could return with a negative finding does not, without more, require the submission of a lesser included offense—murder in the second degree." *Cummings*, 326 N.C. at 317, 389 S.E.2d at 77. Furthermore the " 'mere possibility that the jury might believe part but not all of the testimony of the prosecuting witness is not sufficient

to require the Court to submit to the jury the issue of defendant's guilt or innocence of a lesser offense than that which the prosecuting witness testified was committed.'" *State v. Shaw*, 305 N.C. 327, 343, 289 S.E.2d 325, 334 (1982) (quoting *State v. Lampkins*, 286 N.C. 497, 504, 212 S.E.2d 106, 110 (1975)). Therefore, it was error for the trial court to submit second degree murder as an alternative verdict in this case.

II

Generally, the submission of a lesser included offense in the absence of substantial evidence to support the lesser verdict, invites jurors to disregard their oaths and to reach verdicts by compromise. *See State v. Lampkins*, 286 N.C. 497, 504, 212 S.E.2d 106, 110 (1975), *cert. denied*, 428 U.S. 909, 49 L.Ed.2d 1216 (1976) (submission of instructions in absence of evidence of lesser included offense invites "a compromise verdict whereby the defendant would be found guilty of an offense, which he did not commit"); *State v. Bullock*, 326 N.C. 253, 258, 388 S.E.2d 81, 83 (1990) ("one of the purposes of [instructing on second degree murder only when there is evidence to sustain such a verdict] . . . is to eliminate compromise verdicts"); *see also People v. Knieling*, 443 N.E.2d 207, 212 (Ill. App. Ct. 1982); *People v. Vail*, 227 N.W.2d 535, 536 (Mich. 1975); *Bellcourt v. State*, 390 N.W.2d 269, 273 (Minn. 1986); *State v. Gross*, 351 N.W.2d 428, 431 (N.D. 1984).

Nonetheless, our courts have frequently held that an erroneous charge on a lesser included offense is error favorable to the defendant when all the evidence tends to support a greater offense. *State v. Vestal*, 283 N.C. 249, 252, 195 S.E.2d 297, 299, *cert. denied*, 414 U.S. 874, 38 L.Ed.2d 114 (1973). However, "the finding of prejudice or lack of it must always turn upon the facts and circumstances of the individual case." *Ray*, 299 N.C. at 166, 261 S.E.2d at 798.

[3] The resolution of the issue of prejudice requires an analysis of whether the error is one relating to rights arising under the Constitution of the United States. N.C.G.S. § 15A-1443 (1988). If the right affected arises under the Constitution of the United States, the defendant is presumed prejudiced "unless the appellate court finds that it was harmless beyond a reasonable doubt," the burden of proof being on the State. N.C.G.S. § 15A-1443(b); *State v. Autry*, 321 N.C. 392, 399-400, 364 S.E.2d 341, 346 (1988). If the right affected does not arise under the Constitution of the United States, the defendant is prejudiced "when there is a reasonable possibility

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises," the burden being on the defendant. N.C.G.S. § 15A-1443(a). Aside from the placement of the burden of proof, each standard is substantially equivalent to the other. *See Chapman v. California*, 386 U.S. 18, 23-24, 17 L.Ed.2d 705, 710-11, *reh. denied*, 386 U.S. 987, 18 L.Ed.2d 241 (1967). In addition, "some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error. . . ." 386 U.S. at 23, 17 L.Ed.2d at 710.

[4] As a general proposition, where there is insufficient evidence of all the elements of the offense for which the defendant is convicted, a defendant's federal due process rights are violated. *Thompson v. City of Louisville*, 362 U.S. 199, 206, 4 L.Ed.2d 654, 659 (1960); *see also* Annotation, *Lack of Evidence Supporting State Conviction of Criminal Offense as Violation of Federal Due Process*, 15 L.Ed.2d 889 (1966); Annotation, *Due Process—Conviction Without Proof*, 80 A.L.R.2d 1362 (1961). More specifically, the United States Supreme Court has held that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such instruction. The jury's discretion is thus channeled so that it may convict a defendant of any crime fairly supported by the evidence." *Hopper v. Evans*, 456 U.S. 605, 611, 72 L.Ed.2d 367, 373 (1982) (emphasis in original). The *Evans* Court discussed *Roberts v. Louisiana*, 428 U.S. 325, 49 L.Ed.2d 974 (1976), in which it had invalidated a Louisiana statute which required instruction on lesser included offenses of murder "even if there is not a scintilla of evidence to support the lesser verdicts." 428 U.S. at 334, 49 L.Ed.2d at 982. In *Evans* the Court reiterated that:

> Such a practice was impermissible . . . because it invited the jurors to disregard their oaths and convict a defendant of a lesser offense when the evidence warranted a conviction of first degree murder, inevitably leading to arbitrary results.

456 U.S. at 611, 72 L.Ed.2d at 373. Regarding the constitutional propriety of giving a lesser included offense instruction where, as in *Evans*, no evidence of that offense existed, the Court there stated that "instruction on a lesser offense in this case would have been impermissible absent evidence supporting a conviction of a lesser offense." *Id.* The North Carolina Supreme Court, citing *Evans*, also held that it would be impermissible to instruct on a lesser offense in the absence of evidence supporting that offense. *Strickland*,

307 N.C. at 289, 298 S.E.2d at 655. We conclude that the submission to the jury of the possible verdict of second degree murder, where the evidence tended to support only first degree murder, was an error of federal constitutional dimensions thereby violating defendant's federal due process rights.

We note that the Court in *Ray* applied the "reasonable possibility" standard of N.C.G.S. § 15A-1443(a) for determining prejudice. *See also State v. Mercado*, 72 N.C. App. 521, 325 S.E.2d 313, *rev. denied*, 314 N.C. 659, 336 S.E.2d 87 (1985). However, in those cases the courts did not address the constitutional implications of the erroneous instructions since the defendants there apparently failed to raise the issue. Here the constitutional implications are argued by the defendant. *See State v. Ross*, 322 N.C. 261, 367 S.E.2d 889 (1988).

[5] The question next presented is whether the State has met its burden under § 15A-1443(b) of demonstrating beyond a reasonable doubt that the instructions to the jury on second degree murder constituted harmless error. If this court can conclude that "had the jury not been given the unsupported lesser offense [here second degree murder] as an alternative, it most certainly would have returned a verdict of guilty of a higher offense [here first degree murder] . . . [then the] defendant has no cause for complaint." *Ray*, 299 N.C. at 163, 261 S.E.2d at 797; *Autry*, 321 N.C. at 400, 364 S.E.2d at 346 ("presence of *overwhelming* evidence of guilt may render error of constitutional dimensions harmless beyond a reasonable doubt") (emphasis added). Our inquiry therefore is whether the State presented overwhelming evidence of first degree murder such that all the jurors certainly would have been convinced beyond a reasonable doubt of the defendant's guilt of first degree murder.

To prove first degree murder in this case, it was necessary for the State to prove: (1) that the principal committed first degree murder; (2) that defendant was not present when the murder occurred; and (3) that defendant procured, counseled or commanded the principal to commit the crime. *See Woods*, 307 N.C. at 218, 297 S.E.2d at 577. On the first two elements, the State's evidence was uncontradicted. However, on the third element the evidence was contradicted. Because of the strength of defendant's evidence, we are not prepared to say that, absent the erroneous submission of second degree murder, the jury would have returned a

verdict of guilty of first degree murder. While Stuffel testified that the defendant did procure and counsel him to commit the murder of her husband, the defendant denied doing so. The record shows that both Stuffel and Tart lacked credibility. Jurors could have disregarded their testimony. Furthermore, Michelle Honeycutt's testimony, if believed by the jury, tends to show the defendant did not manipulate her husband into retrieving her pocketbook. Jurors could rationally believe that Stuffel merely waited for an opportunity to arise to attack Dan. In addition, a juror could believe that the defendant's failure to immediately tell the police about Stuffel's relationship to her and her husband arose from her wish to protect her husband's reputation. While the defendant's evidence is not without ambiguity and inconsistencies, a rational juror could find that it raises considerable doubt as to her alleged participation in the crime. Accordingly, the evidence of defendant's guilt of first degree murder is not overwhelming, and therefore the State has not met its burden of rebutting the presumption that the violation of defendant's constitutional rights was prejudicial.

### III

[6] The defendant may not now be retried for first degree murder. Conviction of second degree murder acts as acquittal of first degree murder, and thus retrial would place the defendant in double jeopardy in violation of her rights under the Fifth and Fourteenth Amendments to the Federal Constitution. *Price v. Georgia*, 398 U.S. 323, 26 L.Ed.2d 300 (1970); *see also State v. Cousin*, 292 N.C. 461, 233 S.E.2d 554 (1977); *see generally* 21 Am.Jur.2d *Criminal Law* §§ 270, 319 (1981). Furthermore, the defendant may not be retried for second degree murder or for any lesser included or related offense since we have determined that, as a matter of law, no evidence exists as to that offense. *See Greene v. Massey*, 437 U.S. 19, 57 L.Ed.2d 15 (1978) (double jeopardy clause bars retrial of defendant where conviction was reversed for lack of evidence); *see generally* 21 Am.Jur.2d *Criminal Law* § 309, at 539-40 (1981).

### IV

[7] The defendant next asserts that the trial court erred in failing to grant her motions to dismiss the charge of conspiracy to commit murder. The defendant argues that, as matter of law, a jury cannot convict her of both second degree murder and of conspiracy to commit murder since it is legally impossible to conspire to commit second degree murder.

Conspiracy has been defined as follows:

> A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means. *State v. Littlejohn,* 264 N.C. 571, 142 S.E.2d 132 (1965). To constitute a conspiracy it is not necessary that the parties should have come together and agreed in *express* terms to unite for a common object: " 'A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense.' " *State v. Smith,* 237 N.C. 1, 16, 74 S.E.2d 291, 301 (1953) quoting *State v. Connor,* 179 N.C. 752, 103 S.E.2d 79 (1920). The conspiracy is the crime and not its execution. *State v. Lea,* 203 N.C. 13, 164 S.E. 737 (1932).

*State v. Bindyke,* 288 N.C. 608, 615-16, 220 S.E.2d 521, 526 (1975).

Since conspiracy occurs when the agreement is made, a conviction for conspiracy is not affected by the degree of the substantive crime, or even by the nonoccurrence of the crime. *See State v. Guthrie,* 265 N.C. 659, 144 S.E.2d 891 (1965). The evidence tends to show and a jury found that the defendant conspired with Carl Stuffel to commit murder. The defendant's conviction for second degree murder as an accessory before the fact has no bearing on her conviction for conspiracy to commit murder. The conspiracy conviction was based on defendant's agreement with Stuffel to have her husband killed. The second degree murder conviction was based on the defendant's alleged acts of leaving her purse at the church and sending her husband back to get it after having procured Stuffel to kill her husband. Therefore the jury did not render inconsistent verdicts.

V

The defendant next assigns as error the trial court's failure to receive proffered testimony which the defendant claims concerns Stuffel's interest in the outcome of the case. Error, if any, in the trial court's failure to take the proffered testimony, was nonprejudicial since Stuffel did in fact testify and was extensively cross-examined by the defendant.

VI

[8] The defendant next assigns as error the trial court's refusal to allow a layperson to testify and submit documents showing how

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

he had taken some letters, cut them up and pasted the various words and phrases together to form new letters of a different message and then xeroxed the result. The defendant wished to submit this evidence to demonstrate her theory to the jury that someone, such as Stuffel who had access to her writings, could have created these xerox love letters entered in evidence by the State by cutting and pasting her writings.

The trial court characterized the proffered evidence as an experiment which did not meet the criteria of admissibility for experiments. The trial court also found the jury would be confused by the evidence and that the evidence was unfairly prejudicial to the State.

We find the trial court erred. The proffered evidence was not an experiment. Rather it was a demonstration. A demonstration has been defined as "an illustration or explanation, as of a theory or product, by exemplification or practical application." *State v. Hunt*, 80 N.C. App. 190, 193, 341 S.E.2d 350, 353 (1986).

> [T]he admissibility of demonstrative or experimental evidence depends as much, as for any other piece of evidence, upon whether its probative value is outweighed by the potential undue prejudicial effect it may have on defendant's case. *See* Rule 403, N. C. Rules Evid. In the case of a courtroom demonstration, the demonstrator may not need to be qualified as an expert in the same way as an experimentor, but a proper foundation still must be laid as to the person's familiarity with the thing he or she is demonstrating.

*Id.*

The State had already entered into evidence three xeroxed papers which appeared to have been made from love letters purportedly from the defendant to Stuffel. In response to the State's repeated demands that she explain how her handwriting found its way onto the xerox documents, she sought to demonstrate to the jury that anyone could paste together a letter from collected sentence fragments which would appear, after photocopying, to be a true letter.

The State argued that the defendant had no basis on which to present this theory since she had not presented evidence of how Stuffel had access to each and every word used in the xeroxed documents. We think the State attempts to place too heavy a burden

on the defendant. She did present evidence showing that she had written various legitimate letters to Stuffel and that Stuffel had lived with the defendant and her husband for some time. It was within the province of the jury to determine, given Stuffel's access to the defendant's writings, the likelihood of her theory.

Here, the fact that a layperson sought to discuss the theory and present real evidence demonstrating its feasibility does not make the layperson's testimony inadmissible. The defendant's proffer revealed that his witness had successfully cut up letters, pasted the words and phrases together and xeroxed them to produce photocopies of what appeared to be authentic letters.

The record contains no indication the jury would have been confused by the evidence or that the State's case would have been *unfairly* prejudiced. We hold the trial court abused its discretion in disallowing this evidence.

However, we find the trial court's error did not prejudice the defendant since a reasonable possibility does not exist that the outcome of the trial would have been different had the error not occurred. *See* N.C.G.S. § 15A-1443(a). The defendant was not prejudiced because she had already entered in evidence the essential theory which she sought to further elucidate upon through the laywitness. On redirect examination the following colloquy occurred:

Q. Ms. Arnold, were you present when Barbara Tart supposedly Xeroxed these letters and the post marked envelopes?

A. No.

Q. So you don't know whether she Xeroxed them all off of the same original, or whether she took a bunch of originals, cut them up, and pasted them together and Xeroxed them as her work product, do you?

A. No sir.

Q. Have you ever done anything like that, trying to compose a forgery by using a Xerox machine?

A. No sir.

From this testimony the jury was exposed to the theory through which the defendant sought to explain the presence of what appeared to be her handwriting on the xeroxed letters. Since the

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

defendant had no direct evidence that Ms. Tart in fact produced the photocopies in this manner, an additional witness could have done no more than verify the possibility of composing letters by cutting and pasting. Since such a possibility is hardly beyond the ken of the average juror, we find that the refusal to allow additional testimony was not prejudicial.

## VII

The defendant next assigns as error the trial court's decision to allow Stuffel to assert his Fifth Amendment right to decline to testify. Although Stuffel declined to testify when first called by the defendant, he did later testify and was cross-examined by the defendant. Therefore, we find that if the trial court erred, it could not have prejudiced the defendant.

## VIII

[9] The defendant next asserts that the trial court erred in finding an aggravating factor unsupported by evidence or in improperly weighing this factor against several mitigating factors. The trial court found as a statutory aggravating factor that: "The defendant took advantage of a position of trust or confidence to commit the offense." N.C.G.S. § 15A-1340.4(a)(1)(n) (1988). The trial court also found five mitigating factors. Those factors were:

1. The defendant has no record of criminal convictions.

2. The defendant was a passive participant in the commission of the offense.

3. The defendant acted under strong provocation.

4. The relationship between the defendant and the victim was an extenuating circumstance.

5. The defendant has been a person of good character and has had a good reputation in the community in which she lives.

A finding of an aggravating factor under N.C.G.S. § 15A-1340.4(a)(1)(n) is appropriate where there exists "a relationship between the defendant and the victim generally conducive to reliance of one upon the other." *State v. Daniel*, 319 N.C. 308, 311, 354 S.E.2d 216, 218 (1987). A position of trust or confidence may arise within the context of a familial relationship so long as the familial relationship is not an element of the offense of which the defendant was convicted. *See State v. Goforth*, 67

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

N.C. App. 537, 538, 313 S.E.2d 595, 596, *rev. denied*, 311 N.C. 765, 321 S.E.2d 149 (1984) (position of trust aggravating factor in sentencing for attempted rape of stepdaughter); *see also State v. Caldwell*, 85 N.C. App. 713, 355 S.E.2d 813 (1987) (position of trust aggravating factor in sentencing for taking indecent liberties with a minor, here stepson). Furthermore, since this court has found a position of trust or confidence between best friends, *State v. Potts*, 65 N.C. App. 101, 308 S.E.2d 754 (1983), *rev. denied*, 311 N.C. 406, 319 S.E.2d 278 (1984), we hesitate to find that a man and wife do not occupy a position of trust. While it is conceivable that some husband and wife relationships may not be "generally conducive to reliance of one upon the other," here the evidence could support the trial court's conclusion that a position of trust was present and violated.

[10]  In addition, we hold the trial court did not abuse its discretion in finding one aggravating factor outweighed five mitigating factors. "The weight to be given mitigating and aggravating factors is a matter solely within the trial court's discretion, and the balance struck by the trial court will not be disturbed if supported by the record." *State v. Penley*, 318 N.C. 30, 52, 347 S.E.2d 783, 796 (1986) (one aggravating factor outweighed seven mitigating factors); *see also State v. Ahearn*, 307 N.C. 584, 300 S.E.2d 689 (1983). We find that a record which can support a conclusion that the defendant conspired to murder her husband supports the balance struck by the trial court even in light of the five mitigating factors.

## IX

[11]  In her last assignment of error the defendant contends the trial court erred by not clearly limiting its conspiracy instructions to conspiracy to commit first degree murder. The defendant failed to request an instruction of the trial court or to object to that portion of the charge as required by Appellate Rule 10(b)(2) (1988), and has failed to argue plain error. *See State v. Reilly*, 71 N.C. App. 1, 3, 321 S.E.2d 564, 566 (1984), *aff'd*, 313 N.C. 499, 329 S.E.2d 381 (1985) ("the brief must specifically, and not obliquely, raise the issue"). Accordingly, she is barred from raising this assignment of error on appeal. This result would also follow under the new Rule of Appellate Procedure 10(c)(4) (1989).

STATE v. ARNOLD

[98 N.C. App. 518 (1990)]

Second degree murder—reversed.

Conspiracy—no error.

Judge PARKER concurs.

Judge EAGLES dissents.

Judge EAGLES dissenting.

I respectfully dissent.

I agree with the rule of law that the submission to the jury of second degree murder as a possible verdict, where the evidence tends to support only first degree murder, violates defendant's federal due process rights. Contrary to the majority's view, however, I believe that in this record there is evidence justifying the submission to the jury of the lesser included offense of second degree murder.

The majority states that evidence that the principal committed first degree murder and that the defendant was not present when the murder occurred was uncontradicted. I agree that there is ample evidence to support the principal's conviction for first degree murder. However, I suggest that while this evidence is characterized by the majority as "uncontradicted," the evidence is not unequivocal and could also have supported a verdict of second degree murder as to the principal.

Parenthetically, I have carefully reviewed the record and conclude that the evidence is equivocal as to whether the homicide here was committed by "lying in wait." The significance of that factor, i.e., whether the murder was committed by "lying in wait," lies in the Supreme Court's holding that where a homicide is committed by poison, lying in wait, imprisonment, starvation or torture, "premeditation and deliberation is not an element of the crime of first degree murder." *State v. Johnson*, 317 N.C. 193, 203, 344 S.E.2d 775, 781 (1986). Here, to support a theory that the murder occurred other than by lying in wait, I rely on Tart's testimony that Stuffel told him that he (Stuffel) and the victim "had gotten into a fight" and that he (Stuffel) "wished it hadn't happened." Defendant testified that based on her revelation to the victim that Stuffel had forced her to have sex with him, the victim had become "very angry and . . . visibly upset" at Stuffel and said that he

(the victim) "just wished there were some way he could get even with Carl [Stuffel]." Accordingly, there is some evidence to support a theory of prosecution other than first degree murder perpetrated by "lying in wait," i.e., first degree murder by premeditation and deliberation or second degree murder. I note that the trial court did not charge the jury on the lying in wait theory but charged them on first degree murder by premeditation and deliberation and second degree murder.

The Supreme Court has observed that:

[A]lthough it is for the jury to determine, from the evidence, whether a killing was done with premeditation and deliberation, the mere possibility of a negative finding does not, in every case, assume that defendant could be guilty of a lesser offense. Where the evidence belies anything other than a premeditated and deliberate killing, a jury's failure to find all the elements to support a verdict of guilty of first degree murder must inevitably lead to the conclusion that the jury disbelieved the State's evidence and that defendant is not guilty. The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 657-58 (1983) (emphasis in original).

From this record, I further conclude that because this case was submitted as a premeditation and deliberation case and there is some evidence, in addition to defendant's denial, to negate the element of premeditation and deliberation, the trial court properly submitted second degree murder to the jury.

First, at trial co-conspirator Stuffel testified that he was "under the influence of drugs" at the time Dan Arnold was murdered. In response to the State's question regarding what he did while waiting in the parking lot, Stuffel even admitted that he "smoked mariguana [sic]." Evidence of drug use near the time of a murder has been held to call into question the specific intent needed to

commit first degree murder. *See State v. Propst*, 274 N.C. 62, 161 S.E.2d 560 (1968).

Secondly, the other co-conspirator Tart even testified that he did not know what had happened in Clinton while he was waiting for Stuffel in the car. He stated that he noticed that Stuffel's T-shirt was off and that there was blood on his forearms and hands. Tart further testified that when he asked Stuffel what had happened, Stuffel said he and Dan had gotten "into a fight." Stuffel did not elaborate on any details of the fight. Tart also testified that Stuffel said he "wished it hadn't happened" but did not elaborate. Defendant testified that when she told her husband Dan (the victim) on or about July 6th that Stuffel had forced her to have sex, he (Dan) was "very angry and . . . visibly upset." Defendant testified that Dan had said "that he just wished there was some way he could get even with Carl." This evidence tends to negate premeditation by Stuffel and Tart. While this testimony tends to support the theory that the victim's death was an unplanned happening (as opposed to a premeditated event), this testimony is also relevant in determining whether Stuffel had the requisite specific intent to kill after premeditation and deliberation.

Thirdly, there was testimony from friends of defendant stating that defendant did not think Stuffel was the kind of person who could kill her husband and that she did not think that Stuffel had in fact murdered her husband. Inconsistent with the State's theory of a preplanned, premeditated murder, Michelle Honeycutt, defendant's friend, testified that before Dan, the victim, left that night to go back to the church, defendant offered to go with him to retrieve her pocketbook. Defendant also told Dan, in Ms. Honeycutt's presence, that "I don't have to have [the pocketbook] tonight." Ms. Honeycutt testified that the victim insisted on retrieving the pocketbook from the church that night. This testimony tends to negate the evidence supporting the State's original theory of a preplanned killing that had been the subject of premeditation and deliberation.

Finally, I note that Stuffel's guilty plea to second degree murder was apparently accepted by the court. Under G.S. 15A-1022(c) a trial court "may not accept a plea of guilty . . . without first determining that there is a factual basis for the plea." The majority's conclusion that the evidence "indicates a coldly calculated killing planned well in advance and belies anything other than a

premeditated and deliberate killing" flies in the face of the court's acceptance of Stuffel's guilty plea to second degree murder.

While there was undoubtedly ample evidence to support a conviction for first degree murder on either basis (lying in wait or premeditation and deliberation), there was also more than a scintilla of evidence to support a verdict of homicide less than first degree. *See State v. Smith*, 294 N.C. 365, 380, 241 S.E.2d 674, 683 (1978). The weight and credibility of the evidence is an issue for the jury, not for the court. *See State v. Alston*, 294 N.C. 577, 591, 243 S.E.2d 354, 364 (1978). Reconciliation of conflicts in testimony is a matter for the trier of fact. *State v. Hargrove*, 216 N.C. 570, 571, 5 S.E.2d 852, 852-53 (1939).

We note that the trial court stated on the record that it submitted second degree murder as a possible verdict in part because our Supreme Court had "no trouble with the submission of the second degree possibility" in an accessory before the fact case, citing *State v. Davis*, 319 N.C. 620, 356 S.E.2d 340 (1987). In *Davis*, the Supreme Court reversed and remanded the case based on incomplete jury instructions. The trial court here stated that it submitted second degree murder as a possible verdict because it wanted to be "fair" and Stuffel had been allowed to plead guilty to second degree murder for this homicide. The court also stated that it thought the possible second degree verdict was permitted by the evidence. Submission of second degree murder as a possible verdict would have been error if done without regard for whether there was evidence to support the verdict but solely on the basis of the trial court's notion of "fairness," based on Stuffel's being allowed to plead "guilty" to second degree murder. Here "fairness" was just one of the court's reasons for submitting the lesser offense. The trial court stated unequivocally that he thought the evidence supported the submission of second degree murder.

Considering my conclusions regarding the propriety of submitting the issue of second degree murder to the jury, it is unnecessary to consider the issue of whether the alleged error was prejudicial. I agree with the majority in its disposition of the other assignments of error. However, because there was evidence justifying the submission of the lesser offense to the jury, I find no error with respect to this particular assignment of error. Accordingly, I would vote that there was no prejudicial error in the trial.